UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| JERRY LYNN DAVIS<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF CORRECTIONS; SASHA BANGS; JASON BUTZ; MICHAEL FURST; Corrections Sargent HULL; MARCI NEWLON; Grievance Coordinator T. PLEINES; AARON POLLARD; ELIZABETH ZEIGER; and Defendants DOE 1-7.<br><br>Defendants. | NO.   3:20-cv-05433<br><br>COMPLAINT FOR DAMAGES<br><br>42 U.S.C. § 1983, ADA/RA, and SUPPLEMENTAL STATE CLAIMS<br><br>DEMAND FOR JURY TRIAL |

## I. INTRODUCTION

1.  Disabled Plaintiff Jerry Lynn Davis brings this civil rights action under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA") as a result of his time incarcerated in the Washington prison system. The gravamen of Mr. Davis' claims is that he suffered a broken neck and had emergency surgery before sentencing, and another surgery near the end of his sentence,

COMPLAINT

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
www.MillikanLawFirm.com

1  creating serious medical needs to which the defendants were deliberately indifferent.  Mr. Davis also endured a post-surgery DOC van ride of terror.  The claims mostly arose at Olympic Corrections Center ("OCC") and then Stafford Creek Corrections Center ("SCCC").

## II. PARTIES

2. Plaintiff Jerry Lynn Davis is a citizen of the United States domiciled at all relevant times in Thurston and Pierce Counties and incarcerated in Grays Harbor County.

3. All defendants are named in their individual capacities unless otherwise noted.

4. Washington State Department of Corrections ("DOC") is the state agency operating the relevant prisons and is sued only under statutory claims for which Congress has abrogated Eleventh Amendment sovereign immunity.

5. Defendant Sasha Bangs P.A.-C was at all relevant times a SCCC health care provider.  Defendant Bangs is believed to reside in Bellevue, WA.

6. Defendant Jason Butz was at all relevant times a corrections officer at SCCC.

7. Defendant Michael Furst M.D. was at all relevant times a medical doctor at SCCC.

8. Defendant Corrections Sargent Hull was at all relevant times an employee of OCC.

9. Defendant ARNP Marci Newlon was at all relevant times a health care provider at OCC.

10. Defendant Grievance Coordinator T. Pleines was at all relevant times an employee of OCC.

11. Defendant Aaron Pollard was at all relevant times corrections officer at SCCC.

12. Defendant Elizabeth Zeiger Ph.D. was at all relevant times a mental health provider at SCCC.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **2** of **17**

13. Defendants DOE 1-5 were at all relevant times DOC supervisors and employees at DOC Headquarters, OCC, Washington Corrections Center ("WCC"), and SCC (possibly entitled "property staff, Health Services employee/contract staff," and/or "nursing employee" as described in DOC Policies 440.020 and 650.035, and/or "ADA coordinator"), one or more of whom refused to provide reasonable accommodations or made or assisted in the decision to transfer Mr. Davis without his medication and ADA accommodations, and who confiscated his amitriptyline medication.

14. Defendants DOE 6-7 are responsible for the delay of administrative and/or fiscal authorization for Mr. Davis' surgery and are believed to work in Olympia at DOC headquarters.

### III. JURISDICTION AND VENUE

15. Jurisdiction is established by 28 USC §§ 1331, 1343 and 2201 for claims alleged under 42 USC §1983.

16. Jurisdiction is established by 28 USC § 1367 and exhaustion of appropriate state administrative remedies for all supplemental claims. Additionally, Mr. Davis exhausted all grievances to the highest level as required under 42 U.S.C. § 1997e, though he is released on good behavior to community confinement as of the filing date of this pleading.

17. Venue is proper in the Western District under 28 USC §1391 as most or all defendants are domiciled in the district, most of the events or omissions giving rise to the claims occurred in Grays Harbor County.

### IV. FACTS

18. Mr. Davis was the victim of a fiery drunk driving accident on February 9, 2018, which left him briefly quadriplegic and suffering prolonged PTSD with flashbacks and nightmares

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

of the inferno. His cervical spine was severely damaged, for which he underwent emergency discectomy and fusion surgery on February 12.

19. Mr. Davis was able to use his arms and legs again, but the ensuing recovery period required prescription drug use and exacerbated his preexisting mental health problems, which resulted in termination from Thurston County Drug Court and sentencing to prison. A March 2018 follow-up neurology appointment revealed the onset of stenosis in his cervical spine.

20. Mr. Davis was initially booked into Thurston County jail then transferred to other facilities. All facilities possessed Mr. Davis' medical records and he repeatedly notified them of his physical and mental disabilities and related needs. After sentencing, DOC sent Mr. Davis to WCC, then on to OCC and SCCC. The mistreatment underlying Mr. Davis' claims began at OCC and continued after his transfer to SCCC. Underlying all of Mr. Davis' claims is a systemic discontinuity of care between prisons.

**Facts arising at OCC:**

21. Mr. Davis -a man recovering from a broken neck and related PTSD- arrived at OCC from WCC on or about August 13, 2018. OCC is a prison labor camp with few programs available for an inmate in Mr. Davis' condition. Mr. Davis was and is totally disabled and cannot perform any physical labor whatsoever. At WCC Mr. Davis had been receiving Motrin (high dosage ibuprofen) pain medication but this was discontinued at OCC. Using both medical kites and grievances, Mr. Davis repeatedly notified OCC intake personnel of his extreme neck and back pain and numbness and neuropathic pain radiating down his extremities. The neuropathy started at his arms but now has spread to his legs.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **4** of **17**

22.     Mr. Davis' OCC medical intake files indicate "chronic neck pain" as reported by Dr. Longano and "neuropathy" from a "MVA" as reported by Nurse Hall.  Also noted by Nurse Hall were Mr. Davis' "TBI and PTSD"-related treatment needs.  Hall further noted the need for "cervical pillow and no upper bunk."  Rather than heed these orders, Defendant Newlon created an arbitrary care plan that did not include pain management or physical therapy.  On September 10, 2018 OCC received the full medical chart related to Mr. Davis' February emergency spine surgery.

23.     Despite the foregoing known medical problems, Mr. Davis was assigned a ragged old mattress and kitchen duty, where he was forced to lift items weighing far beyond the safe limits of his disability.  Mr. Davis showed Corrections Officer Cook a new mattress in the storage room.  He also notified his counselor, Mr. Oliver, who assured him a new mattress would be provided.  He begged Defendant Newlon to resolve these issues.  After several months of informally requesting relief Mr. Davis filed grievances to which Defendant Pleines responded that provision of a new mattress would be slowed in retaliation.

24.     As predicted by Defendant Pleines, Defendant Corrections Officer Hull demonstrated the discretion to provide a replacement for Mr. Davis' mattress.  Despite the mattress missing its stuffing, Defendant Hull instead gave Mr. Davis tape to close the ripped seams and taunted Mr. Davis, saying things like "I have no sympathy for you," and hurling accusations of malingering.

25.     According to both Defendants Pleines and Hull, Mr. Davis was afforded no accommodation for his physical disability.  Instead he was "placed on the list to get a new one," along with all the able-bodied work camp inmates.  As threatened by Defendant Pleines, Mr. Davis' desperate pleas resulted in the retaliation of an approximate four-month delay, during which he

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **5** of **17**

suffered debilitating neuropathic pain exacerbated by back and neck pain from inhumane bedding and lack of sleep.

26. From the first day of his intake to OCC, Mr. Davis made his mental and physical distress known to all who could hear, as well as his need of physical therapy and proper medication. Defendant Newlon, having cancelled Mr. Davis' Motrin prescription, months later offered only an antidepressant medication (mirtazapine) and a patch soaked with lidocaine.  Mr. Davis was in severe physical pain and, as a drug offender sentenced under the Drug Offender Sentencing Alternative statute ("DOSA"), reiterated that he needed a non-narcotic pain reliever, not an addictive antidepressant.

27. Mr. Davis begged for pain relief, even of the level that WCC had provided him with Motrin.  Finally, after approximately four months pursuing several grievances and full appeals which prompted an investigation of Defendant Newlon, Dr. William Aurich stepped in and Mr. Davis was provided a new mattress, lifting weight restriction, Motrin and Tylenol, and the opportunity for follow up with his neurologist.  Dr. Aurich replaced Newlon's deliberate indifference with actual medical care until Mr. Davis' eventual transfer to SCCC for surgery.

28. Mr. Davis' neurosurgeon had prescribed physical therapy, medication, and follow-ups as needed.  In October 2018, after months of pain and pleading, Defendant Newlon finally reviewed Mr. Davis' medical records and started the process of getting him a neurology follow-up, which occurred on November 2.  The neurologist recommended an MRI.  It took another month for Mr. Davis to receive an MRI.  The MRI ultimately confirmed the untreated condition about which Mr. Davis had been complaining for the prior five months of anguish -spinal stenosis, cervical radiculopathy, and debilitating neuropathic pain.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **6** of **17**

29. In an attempt to stabilize the mental anguish caused by Newlon, Dr. Aurich prescribed a graduated tenfold increase of Mr. Davis' amitriptyline dosage from 10 to 100 mg. The prescription was for 90 days. Mr. Davis found amitriptyline to be helpful with his mental health issues but objected that Newlon had been using it to treat his pain, as she had done with the useless and addictive mirtazapine.

30. Three months after Defendant Newlon offered "consideration of transfer to another facility for consideration of pain management," Mr. Davis was finally transferred. OCC does not apparently have the capacity to manage the sort of care needed by Mr. Davis. Dr. Aurich and Physician's Assistant Massenburg had sent Mr. Davis off with a fairly stable mental state, bearable pain level, and the assurance that follow-up nerve surgery was approved and forthcoming.

**Facts demonstrating discontinuity of care:**

31. At and between OCC, WCC, and SCCC, Defendants sent Mr. Davis back and forth between staff instead of accommodating his urgent requests for relief, often blaming him for seeking relief from the wrong person or for using the wrong type or style of plea. Defendants DOE 1-5 transferred Mr. Davis without his medically necessary drugs and equipment. This systemic discontinuity of care was a central concern of the Office of the Corrections Ombuds "Systemic Issues Report" of November 22, 2019, which tracks Mr. Davis' time incarcerated.

**Facts arising at SCCC:**

32. On or about February 4, 2019, Mr. Davis was transferred to SCCC via a short stayover at WCC. The purpose was to facilitate follow-up spine surgery. Mr. Davis was accompanied by an extensive "Intersystem & Work Release Transfer Summary" and several "Intra-

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **7** of **17**

system Intake Screening" reports that included all his medications, medical history, special mental and physical needs, and the contact information for his OCC providers.

33. Nonetheless, it was immediately clear upon his February 19 intake that Mr. Davis would be cut 'cold turkey' from the extremely high dosage of amitriptyline on which his body had grown dependent while at OCC. At OCC (continuing through WCC), the amitriptyline was issued as KOP ("Keep On Person") because OCC does not have a 'pill line' system of administering medications. At SCCC, Defendants DOE 1-5 confiscated Mr. Davis' amitriptyline pills, discarded them, and simply acted as though they had never been prescribed to begin with.

34. The cruel 'cold turkey' cessation of high dosage amitriptyline caused Mr. Davis severe withdrawals, psychological torment and nightmares, hallucinations, sleep deprivation, suicidal ideation and back pain at the same time he was suffering from the pinched nerve. Defendant Bangs ignored Mr. Davis' pleas for relief and falsely stated that Mr. Davis had refused all medications. Defendants Furst and Zeiger also ignored Mr. Davis' desperate and repeated pleas.

35. It was not until late March of 2019 that SCCC grievance investigators apparently convinced Defendants of the obvious fact that Mr. Davis had been telling the truth and his prescription was finally restarted. These same grievance coordinators would later delay Mr. Davis' subsequent grievances in an attempt to 'slow walk' him to his early release date. Ensuing discovery will determine whether the delays were effectuated in concert with Bangs' vindictiveness.

36. Defendant Bangs, in apparent retaliation, later declared the restarted amitriptyline sufficient for Mr. Davis' pain needs as well, refusing to provide anything more for his neuropathic suffering. It was obvious that the confiscated amitriptyline pills were indeed prescribed at OCC for

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **8** of **17**

90 days at the end of January.  It was also obvious that SCCC inexplicably cut Mr. Davis off 'cold turkey' in February.

37.     Yet Defendants claimed to have been very confused by their own chart notes. Defendant Furst thereafter included some deflective variation of "at his request" with any mention of amitriptyline in the chart notes, as if to insinuate the discontinuity of care had never occurred. There is nothing unclear about the amitriptyline prescription or its expiration date.

38.     The complete discontinuity of care between OCC and SCCC also resulted in Mr. Davis losing the cervical pillow for which he had fought for months.  The Intrasystem Intake Screening of February 4, 2019 clearly called for a "cervical pillow."  The standing order of Dr. William Aurich, entered January 2, 2019, called for a cervical pillow.  Nonetheless, SCCC did not provide Mr. Davis a pillow again until on or about August 15, 2019, four months after the follow-up stenosis surgery Mr. Davis had been demanding since August 2018.

39.     The delay of surgery that began in OCC and was finally resolved while at SCCC can be summarized as follows:  Mr. Davis notified OCC he was experiencing the effects of stenosis immediately upon arriving in August 2018.  OCC officials were deliberately indifferent to his complaints, ignoring his neurosurgeon's chart notes and delaying a neurology follow up until November 2, 2018.  In December of 2018, OCC officials received Mr. Davis' latest MRI and finally began to believe that which his neurosurgeon had noted way back in March of 2018 -cervical stenosis was damaging Mr. Davis nervous system.

40.     Rather than schedule Mr. Davis for surgery, Defendants DOE decided to transfer him to WCC then to SCCC.  Mr. Davis finally received his stenosis foraminotomy surgery on April 9, 2019, more than a year after his neurologist noted stenosis in the chart.  It was too late to prevent

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **9** of **17**

permanent nerve damage and debilitating neuropathic pain.  The delay was also partly effectuated by Defendants DOE 6-7 refusing or failing to process Mr. Davis' administrative and/or insurance authorization.

**Facts arising after follow-up spine surgery:**

41. Mr. Davis was kept in Providence St. Peter Hospital for post-operative recovery until April 11, 2019.  Defendants Pollard and Butz were assigned to transport Mr. Davis from the hospital in Olympia back to SCCC.  Mr. Davis and his wheelchair were placed into the back of the DOC van for the 60-mile trip with Pollard at the wheel.  Mr. Davis was in great pain and had 22 staples running down the back of his neck.

42. While being haphazardly loaded into the van, Mr. Davis made a polite request to avoid bumps during the long drive.  This request triggered a malicious response from Pollard, who said, "shut up," and slammed the door.  It was clear to Mr. Davis that Pollard had vindictive intentions.

43. Pollard then intentionally sought out bumps in the road and swerved and slammed on the brakes the entire trip back to SCCC.  The first bump caused Mr. Davis so much pain he vomited.  The wet vomit caused his feet to slip off the footrests.  Then Pollard slammed the brakes, which caused Mr. Davis to become slumped over, hanging from his wrist chains, with feet stuck under the wheelchair, his neck staples stretched out by his dangling head.

44. Defendant Officer Jason Butz initially protested Pollard's horrific conduct, even requesting that they return to the hospital to ensure they had not further damaged Mr. Davis' neck.  However, Butz never intervened and later denied it ever happened.  Pollard was laughing as he rolled down his window and continued to drive recklessly.  By the time the van arrived back at

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **10** of **17**

SCCC, Mr. Davis' body had incurred so much trauma that his bladder and bowels were also vacated.

45. Defendants Pollard and Butz admitted to the grievance investigator that Mr. Davis had indeed vomited in the van, and that they contacted the medical department 45 minutes before arriving back at SCCC. Yet Butz claims Mr. Davis was "laughing and carrying on" in the back of the van (ostensibly all the while urinating, excreting, and vomiting on himself).

46. Pollard claimed he drove reasonably yet admits he had to "gown up with bio clothing" to unload Mr. Davis and that he was so "tangled up in his waist chain" that it "took five minutes to untangle him." The DOC records officer has refused to produce video of Mr. Davis' arrival at SCCC. However, Mr. Davis has personally reviewed the shocking video and it must be preserved for the jury.

47. After the April surgery, Mr. Davis was prescribed gabapentin for nerve pain. It took more than three months of pleading and grieving before he would get this drug. Defendants also delayed Mr. Davis' long approved cervical pillow for nearly four months after surgery.

48. Defendant Bangs, having falsified Mr. Davis' primary encounter report to absurdly read "Pt. declined all treatment plans offered" and having ignored a 90-day prescription of amitriptyline, intentionally delayed both the gabapentin and cervical pillow in retaliation for Mr. Davis' grievances against her. Defendant Bangs unceremoniously resigned at the end of August 2019.

49. All the foregoing deliberate indifference was supported by the intentionally delayed processing of Mr. Davis' grievances. Assistant Superintendent Van Ogle personally reprimanded

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **11** of **17**

SCCC grievance coordinators for repeatedly violating response timelines. The SCCC grievance coordinators have not been named but may be added during discovery.

50. The following claims incorporate by reference all foregoing relevant facts and those to be established in discovery. Pending further RCW 7.70.160 and Fed. R. Civ. P 11 investigation, Mr. Davis anticipates adding professional negligence claims early in discovery. Any specific explanation of damages is for the edification of the defendants and does not limit those to be proven at trial.

## V.  FEDERAL CAUSES OF ACTION

### FIRST CLAIM

**Eighth Amendment Deliberate Indifference to Serious Medical Needs-OCC (against Defendants DOE 1-5, Newlon, Hull, Pleines).**

51. The foregoing named defendants knew of and disregarded Mr. Davis' serious medical and mental health needs by refusing for several months to provide a sufficient mattress, a cervical pillow, proper pain and mental health medication, occupational lifting-weight restrictions, an x-ray, an MRI, physical/occupational therapy and access to Mr. Davis' neurologist or other appropriate physician.

52. Defendants DOE 1-5 transported Mr. Davis to SCCC (via WCC) without all his medications and without his medically necessary cervical pillow. It would take several months for these to be restored.

53. This deliberate indifference proximately caused severe pain and suffering, mental anguish, and permanent deterioration of Mr. Davis' nerves and resulting permanent pain, numbness, and mental health impairment. The delay of specialty care at OCC caused a proportional share of

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **12** of **17**

the permanent neurological damage also caused by the delay at SCCC, which is pleaded separately infra.

## SECOND CLAIM

**Title II of the Americans with Disabilities Act 42 U.S.C. § 12131 et seq./Rehabilitation Act- OCC (against Defendant DOC).**

54. Mr. Davis had been classified by the Social Security Administration as totally disabled with TBI for years before his incarceration. He was further qualified as disabled by his broken neck and mental health conditions which, when unaccommodated, prevented adequate sleep, concentration and cognition, and physical mobility and lifting.

55. DOC is liable because the Defendants were deliberately indifferent to Mr. Davis' clear need for accommodations in the form of a functional mattress and cervical pillow, effective pain medication, lifting-weight occupational restriction and thereby appropriate work, and mental and physical therapy. Without these accommodations, Mr. Davis was impeded or excluded from daily activities ranging from simple ambulation around the facility to vocational and health care programs, and from benefits like a full night's sleep and the occupational income and experience afforded others at camp.

56. At no time was Mr. Davis able to participate in pain management or therapeutic programs suitable to disabled inmates. The work program at OCC did not provide jobs for someone like Mr. Davis, who was forced to beg for the occasional odd cleaning task while his cohort worked for wages in the kitchen, the forest, and the surrounding community.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **13** of **17**

## THIRD CLAIM

**First Amendment Retaliation for Grieving-OCC (against Defendants Hull, Newlon, Pleines).**

57. As to the four-month delay in acquiring a humane mattress, Defendant Pleines admitted that Mr. Davis' desperate grieving "slows the process down." In retaliation for grieving, Defendant Hull made vindictive comments and taunted Mr. Davis with the new mattress sitting on the storage shelf.

58. As to the denial of medication, Defendant Pleines required that Mr. Davis repeatedly rewrite grievances instead of solving the problems presented clearly on the face of them. These retaliatory delays and make-work tactics chilled Mr. Davis' Free Speech right to communicate his serious medical needs and caused prolonged suffering.

## FOURTH CLAIM

**Eighth Amendment Deliberate Indifference to Medical Needs-SCCC (against Defendants DOE 1-7, Bangs, Furst, Zeiger).**

59. All Defendants knew of and disregarded several of Mr. Davis' serious medical needs. Mr. Davis was tapered up to 100 mg of amitriptyline while at OCC with a prescription renewed to last 90 days beginning January 31, 2019, to be kept on his person ("KOP"). Defendants knew of the prescription and, never examining Mr. Davis for months after his arrival, immediately cut him off this powerful drug "cold turkey" at SCCC.

60. Defendants claimed to be confused despite Dr. Aurich having drawn a large slash mark through the old Amitriptyline prescription and adding the new one beneath it, to expire "05/01/2019." In any case, Mr. Davis incessantly grieved this cruel treatment, putting all defendants on notice.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **14** of **17**

61.     Mr. Davis arrived at SCCC with a standing order for a cervical pillow, which Defendants knew and disregarded.  Mr. Davis did not receive another pillow until after his surgery, nearly six months after his arrival at SCCC.  Defendants disregarded the foregoing facts as well as DOC Policies 440.020, 650.035, and 690.400.

62.     Mr. Davis was transferred to SCCC for the sole purpose of receiving necessary follow-up neck surgery and pain treatment.  Defendants took several months to order Mr. Davis' prerequisite blood work as ordered by his neurosurgeon on January 4, 2019.  Defendants made Mr. Davis languish for several months without surgery, and without pain or mental health medication.

63.     After surgery, Defendants waited several months to provide the gabapentin prescribed by Mr. Davis' neurosurgeon.  Grievance Coordinator Currey, who is not yet named, attempted to obfuscate the months-long gabapentin delay by mischaracterizing the drug as "anti-convulsant" when it is commonly known to relieve nerve pain.

64.     Defendant Bangs doubled the amitriptyline dosage instead, claiming it was an appropriate pain medication.  Mr. Davis repeatedly grieved these issues and even the Department found that those grievances were ignored in violation of Policy 550.100.

65.     These acts of deliberate indifference proximately caused severe pain and suffering, mental anguish, and permanent deterioration of Mr. Davis' nerves and resulting permanent pain, numbness, and mental health impairment.

**FIFTH CLAIM**

**Eighth Amendment deliberate indifference, alternatively Fourth Amendment excessive force during medical transport-SCCC (against Defendants Butz, Pollard).**

66.     Defendants knew they were escorting Mr. Davis back from surgery on his cervical spine. Defendant Pollard intentionally and sadistically used excessive force and disregarded Mr.

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **15** of **17**

Davis extreme medical distress by improperly securing Mr. Davis, hitting every bump with the transport van, swerving, slamming the brakes and violently loading and unloading Mr. Davis. Defendant Butz initially protested but later participated.

67. The Defendants' acts and omissions proximately caused severe pain and suffering, mental anguish, and permanent mental health impairment.

### SIXTH CLAIM

### First Amendment retaliation for grieving-SCCC (against Defendant Bangs)

68. Defendant Bangs deliberately delayed Mr. Davis' surgery and related nerve medications and support equipment, cut Mr. Davis off amitriptyline 'cold turkey,' and refused to provide appropriate pain medication.

69. This was in retaliation for grieving, even going so far as to falsify Mr. Davis' medical records to absurdly indicate he preferred no treatment at all. The retaliation chilled Mr. Davis' Free Speech right to communicate his serious medical needs.

### VI.   STATE CAUSES OF ACTION

### SEVENTH CLAIM

Intentional ("Outrage"), and alternatively negligent, infliction of emotional distress-OCC (against Defendant Pollard).

70. Defendant Pollard intentionally terrorized Mr. Davis during his medical transport, causing him severe and lasting emotional and bodily distress.

### EIGHTH CLAIM

Negligence-SCCC (against Defendants Butz, Pollard).

COMPLAINT

LAW OFFICE OF JACKSON MILLIKAN
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **16** of **17**

71.     Defendants established a special relationship by involuntary detention, owed a duty of care to Mr. Davis during his medical transport.  Defendants breached their duty of care by transporting Mr. Davis in a violent manner, proximately causing his damages.

### VII.     RELIEF SOUGHT

72.     Mr. Davis hereby demands a trial by jury.

73.     Mr. Davis requests all available general, special, and punitive damages for past, present and future injury and deprivation, as well as pre- and post-judgment interest.

74.     Mr. Davis requests the foregoing compensatory and punitive damages in an amount ascertained according to proof, the value of his civil rights to be determined by a jury of his peers.

75.     Mr. Davis requests an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988, 29 U.S.C. § 794a, and any other statutory or common law basis, and for such other relief to which he may be justly entitled in the wisdom of the Court.

Respectfully Submitted,

JERRY L. DAVIS

By s/Jackson Millikan
_____
Jackson Millikan, WSB# 47786
2540 Kaiser Rd NW
Olympia, WA 98502
360.866.3556
Jackson@MillikanLawFirm.com

COMPLAINT

**LAW OFFICE OF JACKSON MILLIKAN**
2540 Kaiser Rd.
Olympia, WA 98502
Telephone: (360) 866-3556
Jackson@MillikanLawFirm.com

Page **17** of **17**