UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JERRY LYNN DAVIS,

                    Plaintiff,

        v.

DEPARTMENT OF CORRECTIONS,
et al.,

                    Defendants.

CASE NO. C20-5433 BHS

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT

        This matter comes before the Court on Plaintiff Jerry Davis's and Defendant

Michael Furst's cross-motions for summary judgment, Dkts. 77, 79, and Davis's and

Defendants Department of Corrections ("DOC"), Timothy Hull, Tonya Pleines, Marci

Newlon, Sasha Bangs, Jason Butz, Aaron Pollard, and Timothy Taylor's (collectively

"DOC Defendants") cross-motions for summary judgment, Dkts. 81, 83. The Court has

considered the briefing filed in support of and in opposition to the motions and the

remainder of the file and hereby rules as follows.

1

## I.   FACTUAL & PROCEDURAL BACKGROUND

2

**A.   Overview**

3

In June 2018, Davis was convicted of Possession of a Stolen Motor Vehicle,

4 Attempting to Elude a Police Vehicle, and Making or Having Burglar Tools and was

5 sentenced to 25 months confinement. Dkt. 84-11 at 41–50. Davis was initially held at

6 Washington Corrections Center ("WCC") from June until August 2018 and was then

7 transferred to Olympic Corrections Center ("OCC"). Dkt. 83 at 2. Davis remained at

8 OCC until February 2019, was briefly transferred back to WCC for approximately two

9 weeks, and was finally housed at Stafford Creek Corrections Center ("SCCC") until his

10 release on September 9, 2019. *Id.*

11

This case arises from Davis's incarceration at OCC and SCCC. Four months prior

12 to his conviction, in February 2018, Davis had neck surgery to address injuries he

13 sustained in a motor vehicle accident. Dkt. 80-1 at 1–6. He primarily alleges that

14 Defendants violated his Eighth Amendment rights by being deliberately indifferent to his

15 serious medical needs that resulted from his neck surgery. Dkt. 66, ¶ 1. He brings suit

16 against DOC and current and former DOC employees: Timothy Hull, OCC Corrections

17 Sergeant; Marci Newlon, OCC Advanced Registered Nurse Practitioner; Tonya Pleines,

18 OCC Grievance Coordinator; Sasha Bangs, SCCC Certified Physician's Assistant; Dr.

19 Michael Furst, Contract Psychiatrist at SCCC; Timothy Taylor, SCCC Health Services

20 Manager 1; Aaron Pollard, SCCC Corrections Officer; and Jason Butz, SCCC

21 Corrections Officer. *Id.* ¶¶ 4–12.

22

1 | **B.    Health Care at OCC**

2       Before his transfer to OCC, Davis was housed at WCC. While at WCC, Davis was

3 examined and cleared to be in general population. A DOC medical professional also

4 referred Davis for a physical therapy evaluation and issued a Health Status Report

5 ("HSR"), or medical directive. Dkt. 84-11 at 4, 35. The HSR directed that Davis was not

6 to be placed in a top bunk in a cell, *id.* at 35, and Davis was given a cervical neck pillow,

7 *see* Dkt. 82-1 at 2.

8       On August 13, 2018, Davis was transferred to OCC. Dkt. 84-11 at 3. DOC

9 Defendants assert that, upon arrival, Davis underwent orientation, received an orientation

10 handbook explaining that he could kite an Americans with Disabilities Act ("ADA")

11 coordinator, and signed a written acknowledgement reflecting receipt of the handbook.

12 *See* Dkt. 102 at 3. They further assert that Davis was given OCC camp rules which stated

13 that each bunk is assigned one mattress. *Id.*; *see also* Dkt. 104-2 at 14.

14       Davis's work assignments were restricted by his sentence, and he was initially

15 assigned to food services. *See* Dkt. 103-6 at 15; Dkt. 82-2 at 14. Before his assignment,

16 he sent a medical kite asking that his chronic neck pain be taken into consideration

17 regarding his job assignment. Dkt. 82-1 at 3. Defendant Newlon responded that Davis

18 needed to bring his request to his inmate counselor and DOC counselor. *Id.*; *see also* Dkt.

19 82-3, Deposition of Martha Newlon ("Newlon Depo."), at 50:13–18. An appointment

20 with Davis's counselors was made. Dkt. 82-1 at 3. The results of the appointment are

21 unclear.

22

On September 6, 2018, Davis met with Newlon for the first time for his complaints of pain, among other things. Dkt. 105-3. Newlon prescribed Davis Amitriptyline (25mg to end November 15, 2018) to address his pain complaints and noted that Davis had a cervical pillow. *See* Dkt. 105, Declaration of Marci Newlon ("Newlon Decl."), ¶ 6. Between September and November 2018, Newlon evaluated Davis approximately five times. *See id.* ¶¶ 6–14. Newlon adjusted Davis's medications, reviewed his outside medical records, and ordered an MRI and x-rays for Davis. *See id.* On November 9, 2018, Davis had a physical therapy session where he requested a lifting restriction from his physical therapist. *Id.* ¶ 13. Newlon declares that Davis did not previously request a lifting restriction from her, nor did she assess that one was medically indicated. *Id.* But after reviewing the physical therapist's notes, Newlon recommended and wrote an HSR for a 10 lb. lifting restriction for Davis on November 21, 2018. *Id.*; *see also* Dkt. 105-10. Davis was subsequently cleared and assigned to work as the chaplain's clerk. Dkt. 103-6 at 16.

On September 12, 2018, Davis sent a kite to Newlon asking for a second and/or thicker mattress. Dkt. 105-4. Newlon responded on September 17, explaining that an extra mattress could not be requested or ordered by an HSR. *Id.* The only kind of mattress that medical (i.e., Newlon in this instance) could request via an HSR was a therapeutic mattress, which Davis did not qualify for. Newlon Depo. at 67:7–11, 68:1–5. This is further reflected in DOC's medical devices policy, which states that mattresses are not issued for medical reasons. Dkt. 103-6 at 18. Standard, non-therapeutic mattresses are solely an issue for custody pursuant to DOC policy. Newlon Depo. at 64:21–65:1.

1    Davis was initially assigned to the F-tier of the Ozette unit while at OCC, and his

2    unit sergeant was Defendant Hull. Dkt. 87, Declaration of Timothy Hull ("Hull Decl."),

3    ¶ 4. As a unit sergeant, upon a request for a mattress replacement, Hull would assess the

4    inmate's mattress to determine whether the mattress is no longer serviceable and is due

5    for replacement. *Id.* ¶ 2. A mattress is no longer serviceable under OCC Standard

6    Operating Procedure if it has become brittle or cracked. *See* Dkt. 87-1. When Davis

7    moved into the F-tier, he requested a new mattress from Hull. Hull Decl., ¶ 4. Hull

8    assessed Davis's mattress and determined that it was still serviceable because it was not

9    brittle or cracked and did not have tears exposing the mattress. *Id.* On November 24,

10   2018, Davis moved to the A-tier of the Ozette Unit. *Id.* ¶ 5. Hull assessed Davis's

11   mattress on or about December 8, 2018 and determined that it needed to be replaced

12   because the mattress had opened. *Id.* Hull directed Davis to bring his mattress for a

13   replacement and replaced his mattress that same day. *Id.*

14   Davis argues that Newlon and Hull conspired together to prevent him from getting

15   a new mattress. *See* Dkt. 99 at 6. On September 6, 2018, Newlon emailed Hull regarding

16   Davis's request for an extra mattress. Dkt. 82-1 at 10. She informed Hull that, while

17   Davis did have a documented neck issue, she could not issue an HSR for an extra

18   mattress without DOC Care Review Committee ("CRC") approval. *Id.* She further stated

19   that CRC approval would be unlikely but that she would present the case if necessary. *Id.*

20   Hull responded, saying that he would not give an extra mattress to any offender without

21   an HSR, and Newlon stated that she could not provide an HSR for an extra mattress. *Id.*

22

at 9–10. Newlon then wrote "Then let's just agree not to send them to each other since no mattress will be forth coming from either direction." *Id.* at 9.

On October 2, 2018, Davis sent a kite to his correctional unit supervisor asking for a thicker mattress. Dkt. 82-1 at 22. He also sent a kite to medical on October 9, 2018 asking for a new mattress, *id.* at 23, and a kite to mental health on October 11, *id.* at 24. Davis filed a grievance about Hull's refusal to give him a new mattress on November 29, 2018. *Id.* at 26. Defendant Pleines responded on December 6, 2018, explaining that Hull received Davis's kite, that Hull would examine his mattress, and that Davis would receive a new mattress if it met the criteria. *Id.* Pleines also explained that there was a possibility of others in line to receive a new mattress ahead of Davis. *Id.*

Davis asserts that neither Newlon nor Hull referred the mattress issue to an ADA coordinator and that Newlon had a duty to notify the ADA coordinator if she felt that a mattress was not medical. *See* Dkt. 99 at 18.

**C.     Transfer to and Health Care at SCCC**

In February 2019, Davis transferred from OCC to SCCC to await cervical surgery. Prior to his transfer, in January 2019, Davis was prescribed Amitriptyline to treat his PTSD; he was prescribed a two-tier regimen starting at 50mg to then increasing to 100mg. Dkt. 80-3 at 10–12. The 50mg prescription was entered into DOC's Correctional Institution Pharmacy Software ("CIPS"), an electronic program with information on inmates' active medications, with an order date of January 22, 2019 and an expiration date of February 10, 2019. Dkt. 84-11 at 34. The entry states that Davis was to take 50mg for ten days and then would increase the dosage. Dkt. 80-5. The 100mg prescription was

1   entered into CIPS as well, albeit with an incorrect year—the order date was February 1,

2   2001, expiring on May 1, 2001. Dkt. 84-11 at 34. Davis's Medication Administration

3   Record ("MAR"), a paper record reflecting medication given to inmates, reflects Davis's

4   Amitriptyline prescriptions and the 100mg prescription's incorrect date. *Id.* Davis's

5   prescriptions were to be kept on his person rather than dispensed at the "pill line." Dkt.

6   78, ¶ 6.

7           In preparation for Davis's transfer, Dr. Elizabeth Zeiger, a SCCC psychologist,

8   emailed Defendant Furst on February 7, 2019 to inform him of Davis's transfer. Dkt. 80-

9   7 at 1. In her email, Zeiger informs Furst that Davis's medications were to expire on

10  February 10 and requested that he "review and determine what needs to be done." *Id.*

11  When Davis transferred from OCC to SCCC on February 19, 2019, DOC personnel

12  confiscated his prescriptions. Dkt. 66, ¶ 30. DOC Defendants assert that, as part of the

13  transfer process, medications are removed from inmates' control and, provided the

14  prescriptions are active, eventually returned to them at the receiving facility. Dkt. 83 at 6.

15          On February 22, 2019, Davis sent a health services kite to Furst and explained that

16  he had not received his medication for his PTSD, i.e., his Amitriptyline prescription, and

17  that he was having severe complications. Dkt. 78-3. Furst reviewed Davis's medical

18  record and CIPS and responded to his kite on February 28, 2019, stating that Davis could

19  request an assessment from Zeiger for psychological testing. *Id.*; Dkt. 78, ¶ 9. Furst states

20  that he likely received the kite on February 28 and may not have been at SCCC before

21  that date that week. Dkt. 78-1, Deposition of Michael Furst ("Furst Depo."), at 91:7–25.

22  Furst asserts that the CIPS record documented that Davis had been taking 50mg of

1    Amitriptyline for ten days only and that the 100mg prescription was not documented in

2    CIPS. Dkt. 78, ¶ 11. Furst testified that his review of Davis's record led him to believe

3    that there were inconsistencies and that he thus referred Davis to an assessment with

4    Zeiger. Furst Depo. at 90:4–20.

5         On February 21, 2019, Davis filed a grievance claiming that medical personnel

6    took a medication from him upon entering SCCC and that they did not return it, causing a

7    medical emergency. Dkt. 84-11 at 39. SCCC received the grievance on February 25,

8    2019. *Id.* A grievance coordinator responded on March 5, 2019, noting that Davis's

9    grievance was not emergent. *Id.* The grievance coordinator then asked Defendant Taylor

10   to investigate Davis's grievance. Dkt. 91, Declaration of Timothy Taylor ("Taylor

11   Decl."), ¶ 3. Taylor reviewed Davis's MAR as part of his investigation, which showed

12   Davis's Amitriptyline prescription with the incorrect 2001 date, and interviewed Davis on

13   March 12, 2019. *Id.* In the interview, Taylor recommended that Davis send a kite to

14   Zeiger, who could then refer him to Furst, and encouraged him to keep working with

15   Stafford Creek Health Services. *Id.* A formal response to Davis's February 21 grievance

16   was filed on March 13, 2019 explaining that Davis's Amitriptyline prescription expired

17   on February 10 and reflecting Taylor's conversation with Davis. Dkt. 91-2.

18        Davis met with Zeiger on March 11, 2019 and expressed his primary complaint

19   that his 100mg Amitriptyline prescription was stopped "cold turkey" when he arrived at

20   SCCC. Dkt. 84-11 at 25–29. Zeiger's notes state that Davis did not participate enough in

21   their interview for her to verify his diagnoses. *Id.* at 27. Her notes also reflect the

22

incorrect entry in CIPS that his Amitriptyline prescription was last prescribed on January 22, 2019 with a stop date of February 10, 2019. *Id.* at 25.

The following day, on March 12, 2019, Davis sent a kite to Furst explaining that he had met with Taylor and requesting a 25mg prescription of Amitriptyline. Dkt. 80-11 at 4. Furst responded the next day, telling Davis to request an appointment "if you are willing to provide an adequate history." *Id.* Davis contacted Furst again via kite on March 14, 2019. *Id.* at 5. Davis again pleaded with Furst to help him and prescribe him Amitriptyline to treat his PTSD and chronic pain. *Id.* Furst responded on March 15 and stated that Davis did not adequately participate in his interview with Zeiger, which was typically required of inmates for a referral to see Furst. *Id.* Furst also told Davis that if the Amitriptyline helped with his pain, to contact his medical provider to negotiate a prescription. *Id.*

On March 19, 2019, Davis saw Defendant Bangs, a Certified Physician's Assistant who offered to restart Davis on a low dosage of Amitriptyline. Dkt. 78-6. Davis declined, stating "Dr. Furst messed this up, it should be him that fixes it." *Id.* Bangs prescribed Davis 25mg of Amitriptyline for one month, but Davis never picked it up. *See* Dkt. 78-7. Furst eventually saw Davis on March 28, 2019, completed an assessment, and prescribed him 25mg of Amitriptyline. Dkt. 78, ¶ 18. When questioned during his deposition about Davis's prescription, Furst testified that he "did not think that [Davis] being on 50 milligrams of Amitriptyline for ten days and then having it stopped represented an urgent situation, either medically or from a mental health perspective." Furst Depo. at 116:11–15.

1    Also while at SCCC, Bangs evaluated Davis on May 8, 2019 and determined that

2    he qualified for a cervical pillow. Dkt. 85-5. She wrote Davis a HSR for the medical

3    device and noted that cervical pillows were on back order. *Id.* Because of the back order

4    status, the HSR Bangs wrote allowed Davis one extra pillow until the cervical pillow was

5    received. *Id.* Davis alleges that he arrived at SCCC with a standing order for a cervical

6    pillow, *see* Dkt. 66, ¶ 49, but does not provide any evidence of such an order.

7    **D.    Transportation Post-Surgery to SCCC**

8    On April 9, 2019, Davis underwent cervical surgery at Providence St. Peter's

9    Hospital in Olympia, Washington. Dkt. 84-11 at 9–11. Defendants Butz and Pollard

10   returned Davis to SCCC two days later in a specially equipped DOC wheelchair van.

11   During transport, Davis was in a wheelchair, wore a cervical collar, and had on ankle and

12   waist restraints. Dkt. 84-5, Deposition of Jason Butz ("Butz Depo."), at 18:19–20, 21:17–

13   22:16. Pollard loaded Davis into the van, tethered his wheelchair to the floor of the

14   vehicle, and secured Davis to his wheelchair with a lap belt and shoulder belt. Dkt. 90,

15   Declaration of Aaron Pollard ("Pollard Decl."), ¶ 3. Davis testified that Pollard shoved

16   him into the van and was knocking him into things. Dkt. 95-6, Deposition of Jerry Davis

17   ("Davis Depo."), at 139:20–140:14. Davis further asserts that he told Pollard to drive

18   careful and avoid bumps and that Pollard said shut up and slammed the door. Dkt. 100-7

19   at 1. Pollard testified that Davis told him to "Be careful of the bumps" and that, in

20   response, Pollard stated "Do you have any idea where we live?" seemingly in reference

21   to the quality of the roads. Dkt. 100-5, Deposition of Aaron Pollard ("Pollard Depo."), at

22   52:21–53:1.

1    Pollard drove the DOC van, while Butz assisted in the transportation. Pollard

2 Decl., ¶¶ 3–4; Dkt. 86, Declaration of Jason Butz ("Butz Decl."), ¶ 3. After Pollard began

3 operating the vehicle, but before getting on the I-5 freeway, Davis began to vomit. *Id.* ¶ 4.

4 Pollard pulled over to the side of the road and gave Davis a vomit bag. *Id.* Butz and

5 Pollard then contacted their shift sergeant to apprise him of the situation. *Id.* The trip

6 resumed, and while on the freeway, Davis vomited again. *Id.* Davis testified that he was

7 not nauseous before entering the van and that Pollard's erratic driving put him in pain and

8 caused him to throw up. Davis Depo. at 141:12–22. At one point during the drive, Davis

9 told Pollard to "stop hitting the bumps." Pollard Depo. at 26:7–9.

10    Pollard declares that he followed all the rules of the road while transporting Davis

11 back to SCCC. Pollard Decl., ¶ 4. Butz and Pollard also declare that at no time during

12 transport did Davis fall out of his wheelchair or did his wheelchair become loose or

13 untethered. *Id.*; Butz Decl., ¶ 4. Davis, on the other hand, testified that he "flipped

14 forward" in his wheelchair during transport. Davis Depo. at 143:21–144:1. Pollard

15 testified that he was not sure how many times Davis vomited in the van but that it may

16 have been more than ten times. Pollard Depo. at 21:17–22:1. Butz testified that Davis

17 vomited more than five times. Butz Depo. at 32:22–33:6. Butz and Pollard called SCCC

18 medical during transport to meet them upon arrival with personal protective equipment.

19 Pollard Decl., ¶ 4.

20    Upon arrival, Butz and Pollard donned personal protective equipment to remove

21 Davis from the van. *Id.* ¶ 5; Butz Decl., ¶ 6. Pollard declares that he attempted to remove

22 Davis, but that Davis became immobile and refused to move. Pollard Decl., ¶ 5. Pollard

1  was ultimately able to remove him from the van and accompanied him to the medical

2  department at SCCC. *Id.*

3  **E.    Relevant Procedural History**

4          Davis sued in May 2020, Dkt. 2, primarily alleging that Defendants violated his

5  Eighth Amendment rights, *see* Dkt. 66, ¶¶ 41 (Newlon, Hull, and Pleines), 47–51 (Bangs,

6  Furst, and Taylor), 52–53 (Butz and Pollard). Davis further alleges that DOC violated

7  Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, *id* ¶¶ 42–44, that Hull, Pleines, and

8  Pollard violated his First Amendment rights by retaliating against him, *id.* ¶¶ 45–46, 52–

9  53, and that Butz and Pollard violated his Fourth Amendment rights through using

10  excessive force, *id.* ¶¶ 52–53. He additionally brings state law claims against DOC for

11  negligence and professional negligence, *id.* ¶¶ 55–57, against Butz for negligence, *id.* ¶

12  55, against Pollard for negligence, outrage, and negligent infliction of emotional distress,

13  *id.* ¶¶ 54–55, and against Taylor and Furst for professional negligence, *id.* ¶¶ 56–57.

14          DOC Defendants move for summary judgment on all claims against them, Dkt.

15  83, and Davis moves for summary judgment as to his Eighth Amendment claims against

16  Hull and Newlon and as to his ADA claim against DOC, Dkt. 81.[1] Davis additionally

17  moves for a preliminary or permanent injunction against DOC and requests that the Court

18  order DOC to comply with the ADA, stating that he will be remanded back to DOC

19  custody.[2] *Id.* at 24–25. Furst and Davis bring cross-motions for partial summary

20  _____

21          [1] DOC Defendants' reply includes a request to strike. To the extent that the Court needs
to rely upon objected-to evidence, the Court will only discuss the relevant objection.

22          [2] Davis also filed a notice of supplemental authority reflecting his new judgment and
sentence to support his arguments for an injunction. Dkt. 118.

1    judgment only on Davis's Eighth Amendment claim. Dkt. 77 (Furst's motion), Dkt. 79

2    (Davis's motion).

3                                    **II.   DISCUSSION**

4    **A.    Summary Judgment Standard**

5            Summary judgment is proper only if the pleadings, the discovery and disclosure

6    materials on file, and any affidavits show that there is no genuine issue as to any material

7    fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

8    The moving party is entitled to judgment as a matter of law when the nonmoving party

9    fails to make a sufficient showing on an essential element of a claim in the case on which

10   the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

11   (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

12   could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

13   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

14   present specific, significant probative evidence, not simply "some metaphysical doubt").

15   Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

16   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

17   versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

18   *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

19          The determination of the existence of a material fact is often a close question. The

20   Court must consider the substantive evidentiary burden that the nonmoving party must

21   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

22   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party. The

nonmoving party may not merely state that it will discredit the moving party's evidence

at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

*Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

nonspecific statements in affidavits are not sufficient, and missing facts will not be

presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Qualified Immunity**

Davis primarily asserts constitutional violations pursuant to 42 U.S.C. § 1983. In

turn, the individually named Defendants argue that they are entitled to qualified

immunity on those claims. "Government officials performing discretionary functions

enjoy qualified immunity from civil damages so long as their conduct does not violate

'clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir. 1989)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In analyzing a qualified

immunity defense, the Court must determine: (1) whether a constitutional right would

have been violated on the facts alleged, taken in the light most favorable to the party

asserting the injury; and (2) whether the right was clearly established when viewed in the

specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant,

dispositive inquiry in determining whether a right is clearly established is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Id.* at 202. In analyzing a qualified immunity defense, courts are "permitted

to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court here will first determine whether Davis's constitutional rights were violated and then determine if his rights were clearly established under the relevant circumstances, if necessary.

**C.      Defendants Newlon & Hull**

Davis asserts that Newlon violated his Eighth Amendment rights while he was incarcerated at OCC by refusing to provide a sufficient mattress, a cervical pillow, occupational lifting weight restricts, and physical/occupational therapy. Dkt. 66, ¶ 41. Davis and Newlon filed cross-motions for summary judgment on this claim.

As to Hull, Davis similarly asserts that Hull violated his Eighth Amendment rights while he was incarcerated at OCC and also alleges that Hull violated his First Amendment rights by retaliating against him. Dkt. 66, ¶¶ 41, 45. Davis and Hull both move for summary judgment on Davis's Eighth Amendment claim, and Hull moves for summary judgment as to Davis's First Amendment retaliation claim.

**1.      Eighth Amendment Claim**

Inmates alleging Eighth Amendment violations based on prison conditions must demonstrate that prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference to serious medical needs of prisoners" constitutes an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison

1    officials display a deliberate indifference to an inmate's well-being when they

2    consciously disregard an excessive risk of harm to the inmate's health or safety. *Farmer*,

3    511 U.S. at 838–40.

4          In the Ninth Circuit, the test for a deliberate indifference Eighth Amendment claim

5    has two parts. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). First, the plaintiff

6    must show a "serious medical need," and second, "the plaintiff must show the

7    defendant's response to the need was deliberately indifferent." *Id.* (internal citations

8    omitted). With regard to deliberate indifference, a prison official is not liable "unless the

9    official knows of and disregards an excessive risk to inmate health or safety; the official

10   must both be aware of facts from which the inference could be drawn that a substantial

11   risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at

12   837. A court may "infer the existence of this subjective state of mind from the fact that

13   the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*,

14   511 U.S. at 842).

15                    **a.    Serious Medical Need**

16         Hull and Newlon argue that Davis has failed to establish that he had a serious

17   medical need. Dkt. 83 at 13. Davis, in turn, argues that he had a serious medical need for

18   a "decent" sleeping mat. Dkt. 81 at 11.

19         A "serious" medical need exists if the failure to treat a prisoner's condition could

20   result in further significant injury or the "unnecessary and wanton infliction of pain."

21   *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by*

22   *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (quoting

1   *Estelle*, 429 U.S. at 104). A medical need is serious where there is (1) "[t]he existence of

2   an injury that a reasonable doctor or patient would find important and worthy of comment

3   or treatment;" (2) "the presence of a medical condition that significantly affects an

4   individual's daily activities;" or (3) "the existence of chronic and substantial pain." *Id.* at

5   1059–60 (internal citations omitted).

6          Davis argues that his spinal cord injury resulted in chronic pain worthy of

7   comment and treatment. He asserts that he had a medical need for a decent mattress. Dkt.

8   81 at 11. Newlon and Hull argue that there is no evidence that any lack of medical

9   devices, including a sufficient mattress, a cervical pillow, occupational lifting weight

10  restrictions, and physical therapy would lead to the substantial risk of serious harm to

11  Davis. Dkt. 83 at 10. They argue that Davis details his chronic pain but that he attempts

12  to frame his serious medical need as a specific demand for a type of equipment—a new

13  mattress.

14         It is arguable that Davis had a serious medical need due to his chronic and

15  substantial pain resulting from his spinal surgery before he was housed at OCC. A

16  reasonable factfinder could find that his medical condition amounted to a serious medical

17  need because a reasonable doctor or patient could find his spinal injury worthy of

18  comment or treatment. Indeed, Newlon treated Davis on approximately five occasions to

19  address Davis's ongoing symptoms from his spinal cord injury. A reasonable factfinder

20  could also find that his condition resulted in chronic and substantial pain. *See, e.g.*,

21  Newlon Depo. at 152:15–22 ("[T]he first time I saw him, I characterized his pain as

22  chronic and related to his prior trauma to his neck, and he was provided medications.").

But it is well established that the Eighth Amendment "requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable." *Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)); *accord Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [an inmate] is not entitled to demand specific care."). Therefore, while the Court concludes that there is a question of fact as to whether Davis had a serious medical need, this serious medical need is not inclusive of his specific demands of medical care.

The question is whether Davis had a serious medical need (which the Court concludes it may not determine as a matter of law at this juncture) and whether Newlon and Hull were deliberately indifferent to his serious medical needs by failing to provide him a new mattress and other medical devices as alleged.

### b.    Deliberate Indifference

While the Court concludes there is a question of fact as to the objective standard of whether Davis had a serious medical need, the Court can conclude as a matter of law that neither Newlon nor Hull were deliberately indifferent.

As to Newlon, to show deliberate indifference, Davis "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (internal quotation

1    omitted). But "[a] difference of opinion between a physician and the prisoner—or

2    between medical professionals—concerning what medical care is appropriate does not

3    amount to deliberate indifference." *Id.* (internal citation omitted).

4          Davis alleges that Newlon was deliberately indifferent by refusing to issue him a

5    sufficient mattress, cervical pillow, occupational weight-lifting restrictions, and

6    physical/occupational therapy. Dkt. 66, ¶ 41. But Davis has not presented evidence from

7    which a reasonable factfinder could draw the conclusion that Newlon's course of

8    treatment was medically unacceptable or that she chose the treatment in conscious

9    disregard of an excessive risk to his health.

10         Davis primarily argues in his response to Newlon's motion and in his own motion

11   that Newlon was deliberately indifferent to his need for a mattress and for an

12   occupational weight-lifting restriction. The Court will address each allegation in turn.

13   First, when Newlon first evaluated Davis in September 2018, Davis already had already

14   been provided a cervical pillow. *See* Dkt. 88-3 at 2. Davis argues that he was completely

15   deprived of a neck-stabilizing pillow but provides no evidence to support that argument

16   or to support that Newlon was involved in any deprivation.

17         Next, Davis underwent physical therapy in September and November 2018 while

18   housed at OCC, *see* Dkt. 84-11 at 5, 7–8, but Newlon did not initiate on-going physical

19   therapy after Davis expressed reluctance to undergo it, *see* Dkt. 89-2 at 2. Davis has not

20   presented evidence that Newlon's decision regarding on-going physical therapy was

21   medically unacceptable or that she made the decision in conscious disregard of an

22   excessive risk to his health.

As to the occupational weight-lifting restriction, Davis originally sent medical kite asking that his chronic neck pain be taken into consideration regarding his job assignment. Dkt. 82-1 at 3. Newlon responded advising Davis to bring his request to his inmate counselor and DOC counselor. *Id.* Prior to Davis's request for a lifting restriction in November 2018 to his physical therapist, Davis did not request a lifting restriction from Newlon, nor did she assess that one was medically indicated. Newlon Decl., ¶ 13. But once a formalized request was made, Newlon investigated and ultimately prescribed a lifting restriction. *See* Dkt. 105-10. There is no evidence that Newlon intentionally delayed a lifting restriction for Davis or that she chose to not prescribe him a restriction prior to November 2018 in conscious disregard to an excessive risk to Davis's health. Rather, Newlon declares that she did not believe one was medically necessary prior to November 2018.

Finally, the thrust of Davis's claim is that Newlon was deliberately indifferent to his need for a new mattress. Davis's motion largely focuses on whether Newlon had the authority to order him a mattress and argues that she should have done more. *See* Dkt. 81 at 12–15. But this is not the standard of deliberate indifference—the issue is whether Newlon's course of treatment was medically unacceptable under the circumstances and whether she chose the course of treatment in conscious disregard to an excessive risk Davis's health. *See Snow*, 681 F.3d at 987. Davis has not adduced evidence of what the excessive risk his health was or evidence that Newlon was consciously aware of the risk and disregarded it. If Newlon should have been aware of a risk, but was not, she has not

1 | violated the Eighth Amendment. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir.
2 | 2004).

3 |       In sum, Davis has not presented sufficient evidence to create as question of fact as
4 | to whether Newlon was deliberately indifferent to a serious medical need. Her actions do
5 | not meet the high standard of deliberate indifference as a matter of law. Davis's motion
6 | for summary judgment is therefore DENIED, and Newlon's motion for summary
7 | judgment is GRANTED. Davis's Eighth Amendment claim against Newlon is
8 | DISMISSED with prejudice.

9 |       As to Hull, "a prison administrator can be liable for deliberate indifference to a
10 | prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for
11 | help.'" *Peralta*, 744 F.3d at 1085–86 (quoting *Jett*, 439 F.3d at 1098). The evidence
12 | presented by Davis and Hull shows that Hull did respond to Davis's requests for a new
13 | mattress. First, while Davis was housed at the F-tier, Hull assessed Davis's mattress and
14 | determined that it was still serviceable and not eligible for replacement. Hull Decl., ¶ 4.
15 | Second, when Davis moved to the A-tier and requested a new mattress, Hull again
16 | assessed the mattress, determined it was eligible to replaced, and replaced the mattress
17 | that same day. *Id.* ¶ 5. Hull's course of action in responding to Davis's requests for a new
18 | or second mattress does not amount to deliberate indifference.

19 |       Furthermore, Davis has not presented evidence that there was a substantial risk of
20 | harm if his mattress was not replaced and that Hull in fact drew such an inference. *See*
21 | *Farmer*, 511 U.S. at 837. Davis appears to argue that Hull should have made the
22 | inference because he was aware that Davis had chronic pain issues. *See* Dkt. 81 at 17–18.

1    But that does not meet the deliberate indifference standard: "If a prison official should

2    have been aware of the risk, but was not, then the official has not violated the Eighth

3    Amendment, no matter how severe the risk." *Toguchi*, 391 F.3d at 1057 (internal

4    quotation and alternations omitted). Davis also lacks evidence that any delay on Hull's

5    part caused him harm; there is no showing of causation of injury. Absent this evidence,

6    Davis's Eighth Amendment claim against Hull fails.

7        Therefore, Davis's motion for summary judgment is DENIED, and Hull's motion

8    for summary judgment is GRANTED. Davis's Eighth Amendment claim against Hull is

9    DISMISSED with prejudice.

10        ### c.   Conspiracy

11        Davis's complaint does not assert a conspiracy claim. *See* Dkt. 66. His partial

12   summary judgment motion argues for the first time that Hull and Newlon conspired

13   together to violate his Eighth Amendment rights. *See* Dkt. 81 at 18–19. He asserts that

14   Hull and Newlon took concerted action to prevent him from sleeping on a decent

15   mattress. *Id.*

16        Newlon and Hull argue, and the Court agrees, that Davis's assertion of a

17   conspiracy claim in his motion for summary judgment is procedurally improper. *See* Dkt.

18   102 at 16. Davis replies that his conspiracy claim did not need to be pled because the

19   email exchange between Newlon and Hull was not produced until after his amended

20   complaint was filed. Dkt. 108 at 7. But a complaint must "give the defendant fair notice

21   of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550

22   U.S. 544, 555 (internal citations and alternations omitted). And the Federal Rules of Civil

1    Procedure allow for amendment after the deadline for amending the pleadings for good

2    cause. *See* Fed. R. Civ. P. 16(b)(4); *In re W. States Wholesale Nat. Gas Antitrust Litig.*,

3    715 F.3d 716, 737 (9th Cir. 2013). Davis's assertion of a new conspiracy claim at this

4    stage is improper, and he provides no authority to support his assertion that he may do so

5    at this juncture.

6         In any event, neither Newlon nor Hull are individually liable for an Eighth

7    Amendment violation so any conspiracy claim, even if properly pled, necessarily fails.

8    Davis's motion for summary judgment on his newly asserted conspiracy claim is,

9    therefore, DENIED.

10        **2.      First Amendment Retaliation Claim**

11        Within the prison context, a claim of First Amendment retaliation requires five

12   elements: "(1) An assertion that a state actor took some adverse action against an inmate

13   (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

14   inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

15   advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th

16   Cir. 2005).

17        Davis argues that a reasonable jury could find that Hull deliberately ignored his

18   need for a new mattress because of his speech and use of the kite and grievance systems

19   and that Hull's actions chilled his exercise of his First Amendment rights without any

20   penological justification. Dkt. 99 at 18–19. Hull, on the other hand, argues that there is no

21   evidence of adverse action or causation. Dkt. 83 at 16–17; Dkt. 109 at 6–7.

22

1    Davis cites to excerpts of his deposition in support of his argument that Hull

2    retaliated against him, *see* Dkt. 99 at 19 (quoting Davis Depo. at 48:5–73:23). Hull

3    objects to that testimony in part because the quote includes substantive edits by Davis's

4    counsel and highlights that the citation spans over twenty pages of deposition testimony.

5    Dkt. 109 at 2–3. He also argues that the testimony contains hearsay. While the Court

6    agrees that the substantive edits do not accurately reflect Davis's complete testimony, it is

7    possible that the testimony could be presented in admissible form at trial. If evidence

8    could be presented in admissible form, those contents may be considered on summary

9    judgment even if the evidence itself is hearsay. *See Fraser v. Goodale*, 342 F.3d 1032,

10   1037 (9th Cir. 2003). The Court has reviewed the entirety of Davis's citation to his own

11   testimony and will consider it because it appears that the testimony could be presented in

12   admissible form as an opposing party's statement, *see* Fed. R. Evid. 801(d)(2), for

13   example.

14   Hull also argues that Davis is trying to amend his retaliation claim to incorporate

15   his complaints in general to Hull. Davis's complaint alleges that Hull retaliated against

16   Davis for "grieving," *see* Dkt. 66, ¶ 45, and now it appears that Davis is arguing Hull

17   retaliated against him because of his speech and use of the grievance systems, *see* Dkt. 99

18   at 19. Davis's responds that Hull retailed against him because of his speech in general,

19   like speaking to Hull outside of Hull's office asking for a new mattress, and not just his

20   use of the formal grievance system.

21   "[S]ummary judgment is not a procedural second chance to flesh out inadequate

22   pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir.

1   2006) (internal quotation omitted). Davis's retaliation claim is limited to how it was

2   pled—that Hull allegedly retaliated against Davis by ignoring his request for a new

3   mattress because of his grievances.

4       Therefore, whether Davis's testimony is admissible or not, Davis has not

5   presented evidence that Hull took any adverse action or that Hull did so because Davis

6   engaged in the grieving process. Davis filed his formal grievance against Hull on

7   November 29, 2018. Dkt. 82-1 at 26. Pleines responded on December 6, explaining that

8   Hull received Davis's kite for a new mattress and would assess his current mattress. *Id.*

9   Hull did just that and examined and replaced Davis's mattress on or about December 8.

10  Hull Decl., ¶ 5. It is unclear to the Court how this timeline of events reflects an adverse

11  action. Rather, it appears that the grievance process was effective and that Davis received

12  a new mattress because his mattress was no longer serviceable. Davis has not presented

13  evidence of the requisite elements of a retaliation claim.

14      Summary judgment is therefore GRANTED, and Davis's retaliation claim against

15  Hull is DISMISSED with prejudice.

16  **D.    Defendant Taylor**

17      Davis asserts claims against Taylor for deliberate indifference to Davis's medical

18  needs in violation of the Eighth Amendment and for professional negligence related to

19  Davis's transfer to SCCC. Dkt. 66, ¶¶ 47–51, 56–57. Taylor moves for summary

20  judgment on both claims. Dkt. 83.

21

22

1

### 1.      Eighth Amendment Claim

2       Davis argues that Taylor's investigation into his February 21 grievance was

3 flawed and caused his Amitriptyline prescription to be cut off for at least seven of the

4 approximately thirty days Davis was without medication. Dkt. 99 at 20. He further asserts

5 Taylor refused to contact providers or look at his "actual" prescriptions. *Id.* Taylor

6 declares that he reviewed Davis's MAR and did not see an active prescription for

7 Amitriptyline. Taylor Decl., ¶ 3.

8       "[A] prison administrator can be liable for deliberate indifference to a prisoner's

9 medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help.'"

10 *Peralta*, 744 F.3d at 1085–86 (quoting *Jett*, 439 F.3d at 1098). At this stage, Davis must

11 present evidence that Taylor was "aware of facts from which the inference could be

12 drawn that a substantial risk of serious harm exist[ed]" and that Taylor in fact drew the

13 inference. *Farmer*, 511 U.S. at 837. He has not met that burden.

14       Taylor was aware of Davis's grievance that his medications were removed when

15 he transferred to SCCC, but Davis's MAR reflected (incorrectly) that his Amitriptyline

16 expired on February 10. Davis has not presented evidence or arguments establishing that

17 an inference of a substantial risk of serious harm could be drawn from the facts that were

18 presented to Taylor at that time and that Taylor drew the inference. Rather, Taylor

19 interviewed Davis, reviewed his medical chart, apparently did not infer any substantial

20 risk of serious harm, and responded to his grievance. *See* Dkt. 91-2. "If a prison official

21 should have been aware of the risk, but was not, then the official has not violated the

22

1   Eighth Amendment, no matter how severe the risk." *Toguchi*, 391 F.3d at 1057 (internal

2   quotation and alternations omitted).

3          Davis has not presented evidence of Taylor's subjective state of mind and has not

4   established an Eighth Amendment claim. Summary judgment is therefore GRANTED,

5   and Davis's Eighth Amendment claim against Taylor is DISMISSED with prejudice.

6          **2.      Professional Negligence Claim**

7          Davis asserts a claim of professional negligence against Taylor, alleging that his

8   conduct "fell below the standard of care expected of a reasonably prudent health care

9   provider." Dkt. 66, ¶ 56. "In Washington, a claim for professional negligence exists

10  against a limited group of licensed professionals, such as health care providers, attorneys,

11  real estate professionals, accountants, clergy, and insurance agents." *Swartz v. Deutsche*

12  *Bank*, No. C03-1252MJP, 2008 WL 1968948, at *23 (W.D. Wash. May 2, 2008)

13  (collecting cases). Davis now seeks to convert his professional negligence claim to a

14  negligence claim because Taylor is not medically licensed. Dkt. 99 at 24.

15         A complaint must "give the defendant fair notice of what the claim is and the

16  grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal citations and

17  alternations omitted). It is not clear to the Court that Davis can convert his negligence

18  claim against Taylor without amendment, and Davis does not provide authority to

19  support his position. *Cf. Wasco Prods.*, 435 F.3d at 992. But even assuming such a

20  conversion would be permissible under the Federal Rules of Civil Procedure, Davis has

21  failed to identify the duty owed to him by Taylor.

22

1    Davis argues that Taylor owed him "a duty of care because of the 'special

2    relationship that results when a custodian has complete control over a prisoner deprived

3    of liberty.'" Dkt. 99 at 24 (quoting *Shea v. City of Spokane*, 17 Wn. App. 236, 242

4    (1977), *aff'd* 90 Wn.2d 43 (1978)). But *Shea* addressed the liability of a city for the

5    negligence of its jail physician, not the duty of a Health Services Manager or another

6    comparable position. *See* 17 Wn. App. at 241. Moreover, Davis's expert was unable to

7    testify on what Taylor's standard of care would be, though she stated that he had an

8    obligation to alert those who could remedy the situation involving Davis's Amitriptyline

9    prescription. *See* Dkt. 95-3, Deposition of Caroline Fisher, M.D. ("Fisher Dep."), at

10   92:23–93:8, 94:2–9. But absent authority supporting his expert's assertion that Taylor

11   had such an obligation, Davis has failed to establish that Taylor owed him a duty either

12   under a professional negligence or negligence claim.

13   Summary judgment is therefore GRANTED, and Davis's professional negligence

14   claim against Taylor is DISMISSED with prejudice.

15   **E.   Defendant Furst**

16   Davis and Furst bring cross-motions for summary judgment on Davis's Eighth

17   Amendment claim. Dkts. 77, 79. Furst argues that Davis lacks evidence to sustain his

18   claim that Furst was deliberately indifferent to his serious medical needs when Davis was

19   transferred to SCCC and his Amitriptyline prescription was inadvertently discontinued.

20   *See* Dkt. 77. Davis, on the other hand, argues that Furst subjectively knew of and

21   disregarded Davis's serious medical needs. *See* Dkt. 79.

22

1

### 1.  Motion to Strike

2    As a preliminary matter, Davis moves to strike evidence filed in support of Furst's

3  motion. Dkt. 94 at 5–7. The majority of Davis's objections are denied as moot because

4  the Court does not rely on the objected to evidence in reaching its decision here. For

5  example, the Court does not rely upon Davis's request to start at a lower dosage of

6  Amitriptyline in determining whether Furst was deliberately indifferent. But, relevant to

7  the issues at hand, Davis moves to strike "all testimonial evidence about what may or

8  may not have been included on the CIPS screen or any mention of CIPS . . . ." *Id.* at 7.

9  He argues that because the contents of CIPS cannot be admitted as a writing and because

10  CIPS is not a medical chart, it should be excluded under Federal Rules of Evidence 1002

11  and 403. But what Furst and other medical care providers saw in CIPS is relevant to the

12  motions at hand. Solely for the purposes of these motions, the Court concludes that the

13  testimony regarding CIPS would likely be admissible under Federal Rule of Evidence

14  1004, and thus the Court will consider the testimony.

### 2.  Eighth Amendment Claim

16    Davis argues that he had a serious medical need when his Amitriptyline

17  prescription was taken from him upon transfer to SCCC and that Furst subjectively knew

18  of and disregarded Davis's serious medical need. Dkt. 66, ¶¶ 47–48.

19    A "serious" medical need exists if the failure to treat a prisoner's condition could

20  result in further significant injury or the "unnecessary and wanton infliction of pain."

21  *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). A medical need is serious

22  where there is (1) "[t]he existence of an injury that a reasonable doctor or patient would

1   find important and worthy of comment or treatment;" (2) "the presence of a medical

2   condition that significantly affects an individual's daily activities;" or (3) "the existence

3   of chronic and substantial pain." *Id.* at 1059–60 (internal citations omitted).

4        Davis's Amitriptyline was taken from him upon transfer to SCCC, and he

5   immediately sent a kite in an attempt to have his medication returned. While Furst

6   testified that he did not think that Davis being on 50mg Amitriptyline for ten days was a

7   serious medical need, *see* Furst Depo. at 116:11–15, Davis's expert reached the opposite

8   conclusion. Dr. Caroline Fisher opines that Davis likely experienced at least five weeks

9   and up to several months of no or incomplete treatment of his symptoms secondary to the

10  cessation of his Amitriptyline prescription. *See* Dkt. 80-9 at 8. This difference in opinion

11  creates a genuine dispute of material fact as to whether stopping Davis's Amitriptyline

12  prescription constituted a serious medical need. Whether a reasonable doctor or patient

13  would find the cessation of Amitriptyline and Davis's symptoms important and worthy of

14  comment or treatment is ultimately a question a finder of fact must determine and cannot

15  be decided at this juncture.

16       However, there is not sufficient evidence to create a question of fact as to whether

17  Furst was deliberately indifferent. Deliberate indifference is the subjective component of

18  an Eighth Amendment claim, requiring a plaintiff to show that the defendant was "aware

19  of facts from which the inference could be drawn that a substantial risk of serious harm

20  exist[ed]" and that he in fact drew the inference. *Farmer*, 511 U.S. at 837. It is arguable

21  that Furst was aware of facts from which an inference could be drawn that Davis had a

22  substantial risk of serious harm. Davis kited Furst five times endeavoring to have his

Amitriptyline prescription re-started. But Furst unequivocally testified that he did not make such an inference. He stated that he "did not think that [Davis] being on 50 milligrams of Amitriptyline for ten days and then having it stopped represented an urgent situation, either medically or from a mental health perspective." Furst Depo. at 116:11–15.

Davis appears to argue that Furst should have drawn an inference and should have done more. *See* Dkt. 79 at 9–11. These arguments sound in negligence, not deliberate indifference. A physician's negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Davis has not presented evidence that Furst deliberately or purposefully acted (or failed to respond) to Davis's serious medical needs. *See Jett*, 439 F.3d at 1096. Absent evidence of this essential element, Davis's Eighth Amendment claim fails as a matter of law. *See Celotex Corp*., 477 U.S. at 323.

Furst's motion for summary judgment is therefore GRANTED, and Davis's motion for summary judgment is DENIED. Davis's Eighth Amendment claim against Furst is DISMISSED with prejudice.

**F.      Defendants Butz & Pollard**

Davis brings claims against Butz and Pollard related to his medical transportation following spinal surgery and returning to SCCC. He alleges that both Butz and Pollard violated his Eighth Amendment rights, or alternatively his Fourth Amendment rights, and that Pollard retaliated against him in violation of his First Amendment rights. Dkt. 66, ¶¶ 52–53. Davis also brings a negligence claim against Butz and Pollard as well as claims

of intentional infliction of emotional distress (commonly referred to as "outrage") and

negligent infliction of emotional distress against Pollard. *Id.* ¶¶ 54–55. Butz and Pollard

move for summary judgment on all claims. Dkt. 83.

### 1.      Fourth Amendment & Eighth Amendment Claims

First, Davis cannot maintain a Fourth Amendment excessive use of force claim as

a matter of law. As Butz and Pollard correctly note, the Fourth Amendment applies only

to those not yet convicted. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989);

*Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2011). After conviction,

the Eighth Amendment "serves as the primary source of substantive protection to

convicted prisoners," including cases where the prisoner challenges a deliberate use of

force as excessive and unjustified. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Davis

fails to cite any authority supporting his position that he, as a convicted, incarcerated

felon, may bring a Fourth Amendment excessive use of force claim. Therefore, Butz and

Pollard's motion for summary judgment on Davis's alternative Fourth Amendment claim

is GRANTED, and that claim is DISMISSED with prejudice.

Second, it is not entirely clear to the Court under what theory Davis brings his

Eighth Amendment claim against Butz and Pollard. Davis's complaint alleges that Butz

and Pollard were deliberately indifferent during the medical transport but also that

Pollard "intentionally and sadistically used excessive force" and that Butz "participated."

Dkt. 66, ¶ 52. Davis's response to DOC Defendants' motion for summary judgment does

not clarify his theory. *See* Dkt. 99 at 21.

1         An Eighth Amendment claim generally takes one of three forms. One type of

2    claim arises when prison officials are deliberately indifferent to a prisoner's serious

3    medical needs. *See Estelle*, 429 U.S. at 104. A closely related claim involves a prisoner's

4    challenges to their conditions of confinement. *See Hope*, 536 U.S. at 737–38. And finally,

5    the third type of claim asserts that prison staff used excessive force. *See Whitley*, 475

6    U.S. at 327; *Hudson v. McMillian*, 503 U.S. 1, 5–7 (1992).

7         Like a deliberate indifference claim, an excessive use of force claim under the

8    Eighth Amendment consists of an objective and a subjective component. The objective

9    component is "contextual and responsive to 'contemporary standards of decency.'"

10   *Hudson*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 103). The Supreme Court has rejected

11   the notion that "serious injury" is required to establish the objective component of an

12   excessive use of force claim but has noted that *de minimis* force is not actionable so long

13   as it is not "of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10 (quoting

14   *Whitley*, 475 U.S. at 327). Consistent with the Supreme Court's jurisprudence, the Ninth

15   Circuit has held that a prisoner "must objectively show that he was deprived of something

16   sufficiently serious." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012) (internal

17   quotation omitted). The subjective component for excessive force claims "turns on

18   whether force was applied in a good faith effort to maintain or restore discipline or

19   maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6

20   (internal quotation omitted).

21        The Court thus considers five factors in analyzing an excessive force claim under

22   the Eighth Amendment: "(1) the extent of injury suffered by an inmate; (2) the need for

1  application of force; (3) the relationship between that need and the amount of force used;

2  (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made

3  to temper the severity of a forceful response." *Bearchild v. Cobban*, 947 F.3d 1130, 1141

4  (9th Cir. 2020) (quoting *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013)).

5      Davis fails to provide evidence for the Court to consider an excessive use of force

6  claim against either Pollard or Butz. The Court cannot discern whether Pollard applied

7  force "maliciously and sadistically," *Hudson*, 503 U.S. at 6, or whether Butz

8  "participated," Dkt. 66, ¶ 52. The same can be said of an analysis under the deliberate

9  indifference standard. There is no evidence that Butz or Pollard knew of and disregarded

10  an excessive risk to Davis's health and safety. *See Farmer*, 511 U.S. at 837. It would be

11  prejudicial to Butz and Pollard for the Court to make inferences from evidence not cited

12  by Davis. It is Davis's duty, not the Court's, to present evidence sufficient to survive

13  summary judgment. *See Celotex Corp.*, 477 U.S. at 323.

14      Summary judgment is therefore GRANTED, and Davis's Eighth Amendment

15  claim against Butz and Pollard is DISMISSED with prejudice.

16      **2.    Negligence**

17      Davis argues that Butz and Pollard owed him a duty "to ensure health, welfare,

18  and safety," *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635 (2010), as corrections

19  officers. Dkt. 99 at 23–24. Davis further asserts that Pollard breached that duty by driving

20  erratically to intentionally harm him and that Butz breached his duty to intervene. *Id.*

21  While Davis does not cite any authority as to Butz's duty to intervene, the Court agrees

22  that Butz and Pollard owed him a duty to ensure his health, welfare, and safety due to

1    their relationship to Davis as jailers and inmate. *See Gregoire*, 170 Wn.2d at 635–36

2    (discussing duty owed).

3         Davis argues that Butz and Pollard owed him a duty, that they breached that duty,

4    and that he suffered damages. However, Davis does not address whether the breach of

5    duty caused his damages. "Negligence requires duty, breach and resultant injury; and the

6    breach of duty must be shown to be a proximate cause of the injury." *Baughn v. Honda*

7    *Motor Co., Ltd.*, 107 Wn.2d 127, 142 (1986) (internal citations omitted). Proximate cause

8    encompasses (1) cause in fact and (2) legal causation, and both must be satisfied. *Id.*; *see*

9    *also Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 753 (1991). "Cause

10   in fact refers to the 'but for' consequences of an act—the physical connection between an

11   act and an injury." *Hartley v. State*, 103 Wn.2d 768, 778 (1985). Legal causation

12   "involves a determination of whether liability *should* attach as a matter of law given the

13   existence of cause in fact." *Id.* at 779 (emphasis in original).

14        Proximate cause is generally a question for the finder of fact, *see Baughn*, 107

15   Wn.2d at 142, but Davis has failed to articulate any evidence or authority to establish that

16   Butz and Pollard proximately caused him damage. A moving party is entitled to judgment

17   as a matter of law when the nonmoving party fails to make a sufficient showing on an

18   essential element of a claim in the case on which the nonmoving party has the burden of

19   proof. *Celotex Corp.*, 477 U.S. at 323. Specifically, Davis has not presented evidence

20   that, "but for" Pollard's driving, he would not have suffered damages. Moreover, as

21   Pollard and Butz highlight, Davis has not disclosed any expert testimony to support his

22   claim. Expert testimony is not always required, but it is necessary "to establish causation

1   where the nature of the injury involves 'obscure medical factors which are beyond an

2   ordinary lay person's knowledge, necessitating speculation in making a finding.'"

3   *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 685 (2008) (quoting *Riggins v.*

4   *Bechtel Power Corp.*, 44 Wn. App. 244, 254 (1986)). Absent evidence of this essential

5   element, Davis's claim fails as a matter of law.

6       Summary judgment is therefore GRANTED, and Davis's negligence claim against

7   Butz and Pollard is DISMISSED with prejudice.

8       **3.    First Amendment Retaliation Claim**

9       Davis alleges that Pollard retaliated against him for asking Pollard to drive with

10  care in violation of his First Amendment rights. Dkt. 66, ¶ 53. Pollard seeks summary

11  judgment on this claim.

12      A retaliation claim requires: "(1) An assertion that a state actor took some adverse

13  action against an inmate (2) because of (3) that prisoner's protected conduct, and that

14  such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the

15  action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at

16  567–68.

17      Davis argues that, viewing the evidence in the light most favorable to him, a

18  reasonable jury could find that his request to Pollard to "take it easy," followed by

19  Pollard telling him to "shut up" and then "driving like a maniac" is a sufficient retaliation

20  claim. Dkt. 99 at 21. These allegations may survive a motion to dismiss, but they are not

21  enough on a motion for summary judgment. While a well-pled "chronology of events

22  from which retaliation can be inferred is sufficient to survive dismissal," *Watison*, 668

F.3d at 1114 (internal citations omitted), Davis must assert more than allegations and provide evidence of his claim because he carries the burden of proof, *see Lujan*, 497 U.S. 888–89. It is not the Court's duty "to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Furthermore, Davis has not presented evidence of causation and fails to establish, through expert testimony or otherwise, that any retaliatory action through intentional, erratic driving was the but-for cause of his vomiting or any other alleged harm. Davis has not presented evidence creating genuine questions of material fact as to whether Pollard retaliated against him.

Summary judgment is therefore GRANTED, and Davis's First Amendment claim against Pollard is DISMISSED with prejudice.

### 4.   Outrage Claim

"Outrage requires proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Robinson v. Pierce Cnty.*, 539 F. Supp. 2d 1316, 1332 (W.D. Wash. 2008) (citing *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003)). "The alleged conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 1332–33 (2008) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59 (1975)). "Whether the conduct is sufficiently outrageous is ordinarily a question for the jury, but courts must initially determine if reasonable minds could differ as to

1    whether the conduct was sufficiently extreme to result in liability." *Id.* at 1333 (citing

2    *Phillips v. Hardwick*, 29 Wn. App. 382, 387 (1981)). "To prevail on an outrage claim, a

3    plaintiff is required to come forward with evidence that he or she actually suffered severe

4    emotional distress as a result of the defendant's conduct." *Sutton v. Tacoma Sch. Dist.*

5    *No. 10*, 180 Wn. App. 859, 871 (2014) (citing *Kloepfel*, 149 Wn.2d at 203).

6         Pollard argues that poor driving does not constitute outrage. Dkt. 83 at 23. The

7    Court concludes that reasonable minds could differ as to whether Pollard's conduct in

8    transporting Davis back to SCCC was sufficiently extreme to result in liability. Pollard

9    declares that he followed all the rules of the road and safely transported Davis, Pollard

10   Decl., ¶ 4, while Davis testified that Pollard drove erratically and caused him immense

11   pain, *see, e.g.*, Davis Depo. at 141:12–22. Driving in such a manner that Davis describes

12   and causing a post-operative patient pain could be sufficiently extreme to establish an

13   outrage claim. The facts surrounding Pollard's driving are plainly disputed, and a trier of

14   fact, viewing the evidence in the light most favorable to Davis, could find in Davis's

15   favor that Pollard's driving was extreme and outrageous conduct.

16        The issue, however, is that Davis has failed to present evidence that Pollard drove

17   erratically to intentionally or recklessly cause him emotional distress. He argues that the

18   Court must presume that Pollard's "maniacal driving" occurred for the purposes of this

19   motion, Dkt. 99 at 24, but that is the standard for a motion to dismiss under Rule 12, not a

20   motion for summary judgment. While the Court views the evidence presented in the light

21   most favorable to the nonmoving party, the non-moving party must present evidence. *See*

22   *Lujan*, 497 U.S. at 888–89; *Celotex Corp.*, 477 U.S. at 323. The Court may not presume

1   at this stage that Pollard's actions in driving Davis back to SCCC was done with the

2   intention to cause him emotional distress without evidence to support such a conclusion.

3       Like his retaliation claim, Davis has not presented evidence of causation and fails

4   to establish the but-for cause of his harm. "It is the parties' responsibility to cite to the

5   materials in the record they wish the Court to consider." *Graham-Sult v. Clainos*, No. C

6   10-4877 CW, 2016 WL 324347, at *2 (N.D. Cal. Jan. 27, 2016) (citing *Forsberg v. Pac.*

7   *N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988) ("The district court is not

8   required to comb the record to find some reason to deny a motion for summary

9   judgment.")). It would be prejudicial to Pollard for the Court to draw conclusions from

10  facts Davis did not brief.

11      Absent evidence of these essential elements of Pollard's subjective intent and

12  causation, Davis's claim of outrage fails. Summary judgment is therefore GRANTED,

13  and Davis's claim of outrage against Pollard is DISMISSED with prejudice.

14      **5.    Negligent Infliction of Emotional Dismiss Claim**

15      "The tort of [negligent infliction of emotional distress] is a limited, judicially-

16  created cause of action that allows bystander family members to obtain damages for

17  'foreseeable' intangible injuries caused by viewing a physically-injured loved one shortly

18  after a traumatic accident." *Colbert v. Moomba Sports, Inc.*, 132 Wn. App. 916, 923

19  (2006) (internal citations omitted). Davis does not claim that he witnessed a family

20  member involved in a traumatic accident or that a family member witnessed him in such

21  an accident. His claim thus fails as a matter of law. Indeed, Davis concedes that this

22  claim was errantly pleaded. *See* Dkt. 99 at 24. Defendants' motion for summary judgment

1   is therefore GRANTED, and Davis's negligent infliction of emotional distress claim

2   against Pollard is DISMISSED with prejudice.

3   **G.    Defendant DOC**

4           Davis alleges violations of Title II of the ADA for the denial of accommodations

5   while housed at OCC and SCCC. Dkt. 66, ¶¶ 42–44. Both Davis and DOC move for

6   summary judgment on this claim, and Davis moves for an injunction against DOC

7   ordering it to comply with the ADA. Davis additionally asserts a negligence claim against

8   DOC arising out of his medical transport, *id.* ¶ 55, and a professional negligence claim

9   arising out of his transfer to SCCC, *id.*, ¶ 57. DOC moves for summary judgment as to

10  these two negligence-based claims. Dkt. 83.

11          **1.      ADA Title II Claim**

12          Title II of the ADA provides that "no qualified individual with a disability shall,

13  by reason of such disability, be excluded from participation in or be denied the benefits of

14  the services, programs, or activities of a public entity, or be subjected to discrimination

15  by any such entity." 42 U.S.C. § 12132. The Supreme Court has held that Title II applies

16  to state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Lee v.*

17  *City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001).

18          To establish a claim under Title II of the ADA, a plaintiff must prove:

19          (1) he is an individual with a disability; (2) he is otherwise qualified to
            participate in or receive the benefit of some public entity's services,
20          programs, or activities; (3) he was either excluded from participation in or
            denied the benefits of the public entity's services, programs, or activities, or
21          was otherwise discriminated against by the public entity; and (4) such
            exclusion, denial of benefits, or discrimination was by reason of [his]
22          disability.

*McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (internal quotations omitted). A public entity may be liable under Title II "if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008).[3] The "failure to provide reasonable accommodation can constitute discrimination." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

Davis argues that he had a disability and that he had a "right to reasonable ADA accommodations of a decent sleeping mat, suitable job duties, and a lifting weight restriction while incarcerated at OCC, and to a cervical pillow while at SCCC." Dkt 81 at 19. DOC argues that there is no evidence of a causal connection between Davis's claimed disability and any denial of services, programs, or benefits. Dkt. 83 at 14–15. It also argues that Davis has not presented any evidence regarding the nature, severity, or duration of his claimed disability. Dkt. 102 at 19–22.

The thrust of Davis's argument is that DOC violates Title II of the ADA by having a "two silos" system to approve medical devices: one system by which health care providers can provide medically necessary accommodations, and another by which ADA coordinators provide ADA accommodations. It appears that Davis argues that his requested accommodations should have been granted under the ADA but were instead

---

[3] There is no significant difference in the analysis of rights and obligations created by the ADA and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq. See* 42 U.S.C. § 12133; *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002). The Court uses case law from both ADA and Rehabilitations Act claims accordingly.

1  routed to medical providers and denied. Davis's arguments are hard to follow, but the

2  Court understands his argument to be that DOC did not provide him reasonable

3  accommodations through a mattress, lifting weight restrictions, and a cervical pillow

4  because of the "two silos" system and that this failure to provide reasonable

5  accommodations violated the ADA.

6     Even assuming the other elements have been met, the issue with Davis's "two

7  silos" argument is that he has not presented evidence or argument that he was denied a

8  reasonable accommodation *because of* his disability. To recover monetary damages under

9  Title II, "a plaintiff must prove intentional discrimination on the part of the defendant."

10  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (internal citations

11  omitted). "To show intentional discrimination, this circuit requires that the plaintiff show

12  that a defendant acted with 'deliberate indifference,' which requires 'both knowledge that

13  a harm to a federally protected right is substantially likely, and a failure to act upon

14  that . . . likelihood.'" *Updike v. Multnomah Cnty.*, 870 F.3d 939, 950–51 (9th Cir. 2017)

15  (quoting *Duvall*, 260 F.3d at 1139). Davis does not address this standard, let alone

16  provide evidence in support of DOC's alleged intentional discrimination. The standard

17  for deliberate indifference under the Eighth Amendment is not equivalent to the

18  deliberate indifference standard under the ADA. Any alleged deliberate indifference by

19  the individually named defendants cannot be used to establish liability under the ADA

20  against DOC.

21     Therefore, absent evidence of an essential element, DOC is entitled to summary

22  judgment on Davis's ADA Title II claim against it. DOC's motion for summary judgment

1    is GRANTED, and Davis's motion is DENIED. Davis's ADA Title II claim is

2    DISMISSED with prejudice.

3         **2.      Request for Injunction**

4         In his motion for partial summary judgment, Davis asserts that he has recently

5    been arrested and has been remanded back to DOC custody. Dkt. 81 at 24–25; *see also*

6    Dkt. 118. He seeks for the first time an injunction (either preliminary or permanent)

7    "ensuring DOC compliance with its own Policy 690.400 and all recommendations of the

8    Ombuds Report of November 22, 2019." Dkt. 81 at 10. DOC argues that it is

9    procedurally improper for Davis to request an injunction when he has not pled a request

10   for such relief. Dkt. 102 at 22–24. It further asserts that Davis is not seeking a remedy

11   that is of the same nature the Court could ultimately grant in the lawsuit at hand.

12        "When a plaintiff seeks injunctive relief based on claims not pled in the complaint,

13   the court does not have the authority to issue an injunction." *Pac. Radiation Oncology,*

14   *LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). There must be a "sufficient

15   nexus" between the claims raised in the motion for injunctive relief and the claims in the

16   underlying complaint. *Id.* at 636. "The relationship between the preliminary injunction

17   and the underlying complaint is sufficiently strong where the preliminary injunction

18   would grant 'relief of the same character as that which may be granted finally.'" *Id.*

19   (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).

20        Davis's ADA claims against DOC arise out of his incarceration from 2018 to

21   2019, not out of any current or future incarceration. Davis may have pled that DOC

22   violated Title II of the ADA while he was previously incarcerated, *see* Dkt. 66, ¶¶ 42–44,

ORDER - 43

but those allegations alone do not establish a sufficient nexus between his alleged claim and his request for injunctive relief. "A court's equitable power lies only over the merits of the case or controversy before it." *Pac. Radiation Oncology*, 810 F.3d at 633. The Court does not have the power to grant the equitable relief requested because the preliminary injunction does not relate to the specific controversy currently before the Court.

Even assuming the Court could grant the requested injunctive relief, Davis has not established the requisite elements for a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (internal citations omitted). "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). Davis has not presented evidence or arguments that he is likely to suffer irreparable harm. He merely argues that, since he is returning to DOC custody, he has standing to request an injunction. This does not satisfy *Winter*, and, even if the Court could grant injunctive relief, Davis fails to establish the need for such equitable relief.

Davis's request for an injunction is, therefore, DENIED.

### 3.   Negligence Claim

It appears that Davis brings a claim of negligence against DOC arising out of Defendants Butz and Pollard's medical transport following Davis's surgery back to SCCC. *See* Dkt. 66, ¶ 55. Davis does not clarify his negligence claim against DOC in his response, and it is the Court's understanding that he brings this claim under the doctrine of respondeat superior. As discussed above, Davis's negligence claim against Butz and Pollard fails as matter of law, and thus his claim against DOC under the same theory fails. DOC's motion for summary judgment is therefore GRANTED, and Davis's negligence claim against it is DISMISSED with prejudice.

### 4.   Professional Negligence Claim

It similarly appears that Davis asserts a professional negligence claim against DOC arising out of Davis's Amitriptyline prescription and transfer to SCCC. *See* Dkt. 66, ¶ 57. DOC moves for summary judgment under the theory that Davis intends to place secondary liability on DOC through Defendant Taylor's actions. Dkt. 83 at 24–25. Davis did not respond to this argument nor did he clarify his theory of liability.

It is the Court's understanding based on Davis's allegations that he seeks to impose vicarious liability on DOC because of Taylor's actions. But as discussed above, Davis's professional negligence or negligence claim against Taylor fails as a matter of law, and thus his professional negligence claim against DOC fails. DOC's motion for summary judgment is therefore GRANTED, and Davis's professional negligence claim against it is DISMISSED with prejudice.

1    **H.    Defendants Pleines and Bangs**

2           Davis alleges that Defendant Pleines violated his Eighth Amendment and First

3    Amendment rights while he was housed at OCC, Dkt. 66, ¶¶ 41, 45–46, and that

4    Defendant Bangs violated his Eighth Amendment rights when he was transferred to

5    SCCC, *id.* ¶¶ 47–51. Davis, in response to DOC Defendants' motion for summary

6    judgment, concedes their dismissal. Dkt. 99 at 4 n.2, 17.

7           However, in Davis's reply to his motion for partial summary judgment against

8    DOC, Hull, and Newlon, he asserts that if the Court finds that his claim involving his

9    cervical pillow at SCCC is not cognizable under the ADA, he does not concede dismissal

10   of his Eighth Amendment claim regarding the cervical pillow against Bangs. Dkt. 108 at

11   5. But Davis failed to present evidence or arguments in opposition to the motion.

12          Where facts asserted by the moving party in an unopposed motion are concerned,

13   the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P.

14   56(e)(2). Bangs wrote a HSR for a cervical pillow, *see* Dkt. 85, ¶ 9; Dkt. 85-5, and it is

15   not demonstrated how her conduct meets the Eighth Amendment deliberate indifference

16   standard detailed above. Further, "a plaintiff cannot bring an action under 42 U.S.C.

17   § 1983 against a State official in her individual capacity to vindicate rights created by

18   Title II of the ADA." *Vinson*, 288 F.3d at 1156.

19          Therefore, summary judgment is GRANTED, and Davis's claims against Pleines

20   and Bangs are DISMISSED with prejudice.

21

22

**I.      Supplemental Jurisdiction**

The sole remaining claim in this case is Davis's state law professional negligence claim against Furst. Neither party moved for summary judgment on this claim.

Under 28 U.S.C. § 1367(a), a federal court may assume supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction so that they form part of the same case or controversy." The Court may decline to exercise this supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The district court should "consider and weigh in each case, at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Considering the factors laid out in *Cohill*, the Court declines to exercise supplemental jurisdiction over the remaining state law claim against Furst. The Court has dismissed all claims over which it has original jurisdiction, and the remaining parties would not be prejudiced by declining supplemental jurisdiction. Indeed, Davis has moved to continue the February 15, 2022 trial date. *See* Dkt. 119. The state court is better situated to handle this single remaining claim.

Davis's professional negligence claim against Furst is therefore DISMISSED without prejudice.

# III.  ORDER

Therefore, it is hereby **ORDERED** that Furst's motion for summary judgment, Dkt. 77, is **GRANTED** and that Davis's motion for partial summary judgment against Furst, Dkt. 79, is **DENIED**. It is hereby further **ORDERED** that DOC Defendants' motion for summary judgment, Dkt. 83, is **GRANTED** and that Davis's motion for partial summary judgment against Defendants Hull and Newlon and for injunction against Defendant DOC, Dkt. 81, is **DENIED**. Davis's professional negligence claim against Furst is **DISMISSED without prejudice**, and all remaining claims are **DISMISSED with prejudice**.

The remaining pending motions, Dkts. 119, 120, 121, 122, 124, are **DENIED as moot**.

The Clerk shall enter JUDGMENT and close the case.

Dated this 11th day of January, 2022.

BENJAMIN H. SETTLE
United States District Judge